## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                         **Plaintiff,**<br><br>                    **v.**<br><br>**DANH C. VO,**<br><br>                                         **Defendant,**<br><br>**PHUONG D. VO,**<br>**MY TIEN THI NGUYEN,**<br>**DANNY H. VO, and**<br>**DIEM T. VO,**<br><br>                                         **Relief Defendants.** | **CIVIL ACTION NO.**<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL**<br>**DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission" or the "SEC") files this Complaint against Defendant Danh C. Vo ("Vo"); and Relief Defendants Phuong D. Vo, My Tien Thi Nguyen, Danny H. Vo, and Diem T. Vo, and alleges as follows:

### SUMMARY

1.      This case involves Vo's scheme that defrauded investors of approximately $48.5 million in connection with his bitcoin mining business called "VBit." Vo solicited investors by lying to them about the nature of the business, its assets, and how he would use their money.

2.      From at least December 19, 2018 through at least February 13, 2022, Vo, through his company VBit Technologies Corp., and its purported successor, Advanced Mining Group, raised over $95.6 million from approximately 6,400 investors in an unregistered and fraudulent offering. Vo claimed that VBit offered investors "a turnkey solution for average people to start making a passive income stream through Bitcoin mining without all the headaches of operating the machines."

3.      Bitcoin mining is the process of earning new bitcoins by using high-speed computers ("mining rigs") to solve complex algorithms to validate and secure transactions on the blockchain.

4.      Vo offered and sold investment contracts to investors that purported to provide investors with passive profits from mining rigs that—though ostensibly purchased by investors from VBit—were entirely controlled and operated by VBit. While some investors received returns on their investments, others suffered substantial losses, and Vo misappropriated $48.5 million.

5.      Vo transferred over $5 million of the misappropriated investor funds to his family members, named herein as Relief Defendants.

6.      On or about November 20, 2021, Vo left the United States with the remainder of the misappropriated funds.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d) and 27(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(d) and 78aa(a).

8.      The Court has personal jurisdiction over the Defendant and Relief Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because, among other things, VBit Technologies Corp. was incorporated in Delaware, Defendant's acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in this District, and harmed victim investors resided in this District during the relevant time.

9.      In addition, this Court has jurisdiction because Defendant engaged in conduct within the United States that constituted significant steps in furtherance of the violations of the federal securities laws alleged in this Complaint.

10.     In connection with the conduct alleged in this Complaint, Defendant, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange—namely, through Defendant's use of the Internet when engaging in the acts and transactions described herein.

## DEFENDANT

11.     **Danh C. Vo**, age 37, was formerly a resident of Philadelphia, Pennsylvania. He founded VBit in 2018 and served as its CEO through at least January 2022. Vo controlled VBit at all times relevant to this Complaint.

## RELIEF DEFENDANTS

12.     **Phuong D. Vo**, age 39, is a resident of Philadelphia, Pennsylvania. She is Danh Vo's ex-wife.

13.     **My Tien Thi Nguyen**, age 58, is a resident of Cherry Hill, New Jersey. She is Danh Vo's mother.

14.     **Danny H. Vo**, age 30, is a resident of Philadelphia, Pennsylvania. He is Danh Vo's brother.

15.     **Diem T. Vo**, age 40, is a resident of Bellmawr, New Jersey. She is Danh Vo's sister.

## RELATED ENTITIES

16.    **VBit Technologies Corp**. was a Delaware corporation based in Philadelphia, Pennsylvania, that offered and sold purported bitcoin mining hosting agreements ("Hosting Agreements") to investors. VBit Technologies Corp. also had subsidiaries, including VBit Mining LLC (which purportedly operated VBit's sales and marketing component) and VBit DC Corp. (which purportedly owned VBit Technologies' own mining operations) (collectively, "VBit"). VBit was purportedly acquired by Advanced Mining Group in or about January 2022. VBit Technologies never registered with the Commission, nor did it register or attempt to register any offering of securities under the Securities Act. It is now defunct.

17.    **Advanced Mining Group** ("Advanced Mining") was purportedly an entity that acquired VBit from Vo in or about January 2022 for $105 million. However, Advanced Mining's only activity prior to the "acquisition" was the lone act of registering a website in November of 2021. Other than a press release issued by Vo, there are no publicly available records memorializing the acquisition of VBit by Advanced Mining, and no records supporting any legitimate business activity ever conducted by Advanced Mining. Advance Mining never registered with the Commission, nor did it register or attempt to register any offering of securities under the Securities Act.

## FACTS

### Background on Crypto Assets and Bitcoin Mining

18.    The term "crypto asset" means any digital representation of value that is recorded on a cryptographically secured distributed ledger.

19.    A "crypto network" is a blockchain or similar distributed ledger technology network.

20.     Crypto networks rely on cryptography and economic mechanism design to eliminate the need for designated trusted intermediaries to verify crypto network transactions and provide settlement assurances to users. The operation of each crypto network is governed by an underlying software protocol, consisting of computer code, which programmatically enforces certain rules, technical requirements, and reward distributions.

21.     Each protocol incorporates a "consensus mechanism," which is a method for enabling the distributed network of unrelated computers (known as "nodes") that maintain the peer-to-peer network to agree on the "state" (or authoritative record of network address ownership balances, transactions, smart contract code, and other data) of the network.

22.     The bitcoin blockchain's consensus mechanism is proof of work ("PoW"), which incentivizes transaction validation by rewarding participants, called "miners," who operate nodes adding computational resources to the PoW network. PoW involves validating transactions on a PoW network and adding them in blocks to the distributed ledger. The "work" in PoW is the computational resources that miners contribute to validate transactions and add new blocks to the PoW network.

23.     Miners use computers to solve complex mathematical equations in the form of cryptographic puzzles. Miners compete with their peers to solve these puzzles, and the first miner to solve a puzzle is charged with accepting batches of transactions from other nodes and validating (or proposing) new blocks of transactions to the PoW network. In exchange for providing validation services, miners earn rewards in the form of newly generated digital commodities that are delivered under the terms of the PoW network's software protocol. In this way, PoW provides an incentive for miners to invest the resources necessary to add valid blocks to the PoW network.

24.    A miner providing validation services receives the reward only after the other nodes on the PoW network verify, through the software protocol, that the solution is correct and valid. To this end, once a miner finds the correct solution, it broadcasts this information to other miners who can verify whether the miner properly solved the puzzle to receive the reward. Once verified, all miners then add the new block to their own copies of the PoW network. PoW is designed to secure the PoW network by requiring miners to spend considerable time and computational resources to authenticate transactions.

25.    In addition to self (or solo) mining, miners can join "mining pools," which allow miners to combine their computational resources to increase their chances of successfully validating transactions and mining new blocks on the PoW network.

26.    "Hashpower" or "hashrate" is the measure of computational power (measured in hash[1] per second) at which computers solve algorithms to mine bitcoin. On its website, VBit advertised that "[t]he higher the hash rate" the more bitcoin that will be mined.

**Vo Offered and Sold Bitcoin Mining Hosting Agreements**

27.    In 2018, Vo started VBit. Throughout its existence (and even after the supposed acquisition by Advanced Mining[2]), Vo had ultimate control over nearly every aspect of VBit, including its public statements, solicitation of investors, the terms of its offering (*i.e.*, the "Hosting Agreements" described below), its use of investor proceeds and purported profits, and its control and operation of mining rigs.

---

[1] "Megahash" is referenced as MH/s, which equals 1 million hashes per second. Gigahash is referenced as GH/s, which equals 1 billion hashes per second. Terahash is referenced as TH/s, which equals 1 trillion hashes per second.
[2] Throughout this Complaint, references to VBit and VBit activities (e.g., offers and sales of Hosting Agreements, etc…) include Advanced Mining and Advanced Mining's activities after Advanced Mining's "acquisition" of VBit in January of 2022.

28.     VBit offered two options related to bitcoin mining: (1) VBit offered mining rigs to customers who wanted to control and operate the mining rigs themselves; and (2) VBit offered bundled mining rigs and "hosting" services to customers who wanted VBit to control and operate the mining rigs.

29.     Under the second option, investors entered into agreements that offered them passive profits from mining rigs that—though ostensibly purchased by investors from VBit— were entirely controlled and operated by VBit ("Hosting Agreements").

30.     VBit's Hosting Agreements were offered to the general public and sold in exchange for money. The transactions were consummated via ACH payments and checks.

31.     Almost every VBit customer entered into a Hosting Agreement.

**Vo Offered Various Tiers of VBit Hosting Agreements**

32.     Through the Hosting Agreements, VBit offered investors several pricing tiers with names such as Bronze, Silver, Gold, Platinum, Diamond, and Black Diamond. The higher the tier, the more processing power to purportedly mine bitcoin, and the more expensive the investment.

33.     The highest and most expensive tier—the Black Diamond hosting package— purported to include eight mining rigs that provided hashpower of 800,000 gigahash per second.

34.     According to VBit's website, the cost for customers to buy the eight mining rigs without entering into a Hosting Agreement was $113,908.

35.     However, VBit offered a pricing incentive that lowered the cost of the mining rigs if an investor entered into a Hosting Agreement. Nearly every investor chose this option.

36.     The price of the hosting services themselves also varied depending on the length of the term. If an investor entered into a one-year Hosting Agreement, the Black Diamond

package would cost the investor $101,701. With a two-year Hosting Agreement, it would cost $95,783.

37.     Under the terms of the Hosting Agreements, investors were required to pay VBit at least 50% of the cost of the mining rigs up front and could pay the remainder over a 36-month period.

38.     From December 2018 through February 2022, VBit raised approximately $95,641,184 from investors, collecting over $78 million in 2021 alone.

39.     In its three-plus years of operations, VBit entered into approximately 10,388 Hosting Agreements with approximately 6,400 investors.

40.     From December 2018 through mid-2022, VBit mined approximately 425.2 bitcoin.

### The Hosting Agreements Offered Investors Passive Income and Gave VBit Control Over the Mining Rigs the Investors Were Purportedly Buying

41.     In marketing and advertising materials, VBit offered one main reason why investors should enter into Hosting Agreements that would allow VBit to host the bitcoin mining rigs it was purportedly selling to them as opposed to the investors taking possession of the machines and mining on their own—to earn a "passive income stream."

42.     VBit marketed its Hosting Agreements by claiming "[t]he average person cannot operate Bitcoin mining rigs in their homes … VBit Technologies offers a turnkey solution for average people to start making a passive income stream through Bitcoin mining without all the headaches of operating the machines."

43.     According to VBit's website:

| **Why should I host my miners with VBit instead of my own facility?** |
| --- |
| Bitcoin mining computer hardware requires technical knowledge to setup, [sic] a well ventilated space and huge amounts of ongoing electricity at a high |

> voltage to operate. You will incur very high fees to set-up the space and high
> ongoing electricity bills to operate, not to mention the loud noise these
> computers generate. So just let us worry about setting it up and maintaining it
> for you while you decide on where to distribute your hashpower and collect
> your rewards!

44.    Investors who purchased Hosting Agreements did not have control of the mining rigs. Under the Hosting Agreements, VBit—not the investors—would manage the mining rigs and had decision making authority over all aspects of the mining rigs.

45.    The Hosting Agreements stated VBit would:

> provide server hosting facility, electrical power, and Internet access to
> Customer at Service Provider's [*i.e.*, VBit] and partner facilities (the
> "Facility") for the purposes of installing, maintaining, and operating
> Customer's servers and ASIC chips (the "Equipment"), which may be updated
> from time to time to add or delete Equipment.

46.    According to the Hosting Agreements, VBit investors were not even allowed to visit the data centers that housed the mining rigs that they purportedly owned without VBit's consent, and if VBit granted permission, any such visit was to be supervised by a VBit representative.

47.    Investors who entered into Hosting Agreements were not provided with any serial numbers or any other information from which they could identify particular mining rigs they purportedly owned because VBit never created or maintained any such records.

48.    The Hosting Agreements set conditions that made it difficult and prohibitively expensive for investors to leave the VBit mining pool (*i.e.*, the collection of mining rigs VBit hosted for its investors) and take possession of the mining rig that they purportedly owned.

49.    While the Hosting Agreements did purport to allow investors the option of allocating their mining rigs to a large-scale mining pool run by a third-party pool operator

different than the one Vo selected, such authority was illusory because investors were not assigned specific mining rigs.

50.    The Hosting Agreements did not allow investors to automatically terminate the agreements. Rather, the Hosting Agreements granted investors only the right to request termination, which was at VBit's discretion.

51.    If VBit granted the termination request, the investor would incur penalties, including forfeiture of all "unused hosting periods/credits" and an acceleration of "all outstanding payments due."

52.    Under the terms of the Hosting Agreements, if an investor's termination request was granted, he or she was also required to request a buyout and ask to have their mining rigs shipped to them within 30 days; otherwise, VBit could keep the mining rigs and store them at the investor's expense. Depending on the investment tier, the fees to ship the mining rigs to investors were as much as $1,800.

53.    Since VBit did not create or maintain any records identifying which mining rigs were purportedly owned by which investors, there was no way for VBit to identify which mining rigs to ship to an investor whose termination request was granted.

54.    Once an investor signed a Hosting Agreement, he or she was solely dependent on VBit's efforts (including housing, operating, and maintaining the mining rigs) for a return on the investment.

55.    VBit's efforts performed in connection with the Hosting Agreements were entrepreneurial and managerial. VBit decided where to physically deploy the mining rigs, selected which brand of mining rigs to offer investors, decided which large-scale third-party group mining pool VBit's mining rigs would participate in, decided whether to switch the mining

rigs to a different large-scale third-party group mining pool, and generally oversaw the operations of the VBit mining pool and the facilities where they were maintained. VBit also had sole authority to design the physical layout of the facility, choose the type of cooling system at the facility, and decide whether to set the mining rigs to low power mode. Without these efforts investors would not earn a profit in the form of bitcoin rewards.

56.     VBit subcontracted the hosting services to a third-party hosting services company to host mining rigs at various data centers in North America, including a facility VBit owned in Montana.

57.     The third-party hosting services company required a dedicated technician onsite every day at the Montana site to perform various physical and information technology skill-related services to ensure that the mining rigs performed at their maximum efficiency.

58.     Services provided by the third-party hosting services company retained by VBit included, but were not limited to:

- setting up the physical layout of the facility;
- conducting diagnostic services on underperforming or failed mining rigs;
- replacing parts on failed mining rigs (*i.e.*, hash boards, fans, and control boards);
- ensuring that the proper temperature was maintained at the facility by adjusting fans and changing filters in the forced-air system not only to keep each mining rig cool and operating efficiently but also to prevent an overheating mining rig from triggering a cascading effect that could result in multiple mining rigs overheating and shutting down;
- changing the large-scale third-party group mining pool in which the VBit investors' mining rigs were participating;
- configuring the network;
- protecting the network from theft and cyberattacks by maintaining a firewall; and
- setting mining rigs to "low power mode" to generate less heat and use less electricity when the price of bitcoin was down.

59.     Certain of these third-party hosting service company tasks—such as changing which large-scale third-party mining pool an investor's rig participated in, or the authority to set mining rigs to "low power mode"—were only done or could only be done at Vo's direction,

while other more routine maintenance tasks were performed by the third-party hosting service company. Investors had no control, input, or visibility into any of these decisions.

60.     In the contract between VBit and the third-party hosting services company, VBit represented that it owned the mining rigs and granted the third-party hosting services company a security interest in the mining rigs.

**Vo Told Investors that the Assets Bundled in their Hosting Agreements Would Be Pooled with the Assets of Other VBit Investors**

61.     VBit told investors, and the investors understood that, as part of VBit's services, the mining rigs they purportedly were buying would be pooled with mining rigs of other VBit investors. VBit's website stated:

> **Where do my rewards come from?**
>
> As we use the computer hardware to mine and validate transactions on the Bitcoin network, we are rewarded for our activity through new coins and transaction fees. All Bitcoins mined will be divided and sent to contract holders according to the contract hash rate.

62.     Early promotional materials touted the benefits of joining VBit's collective mining pool. The materials noted that "[i]t's nearly impossible for individuals to mine because the math is getting so hard to solve that it takes massive computing power to work. The solution… Mining pools! People can share in the profits by pooling together their resources and splitting up the Bitcoin that is mined. There are no limits or restrictions on how big a pool can get."

63.     The bitcoins VBit purportedly mined on behalf of investors were also pooled in custodial wallets controlled exclusively by Vo.

64.     Once those bitcoins were pooled in one of the custodial wallets, they remained there, other than to accommodate limited investor withdrawals.

65.     Vo created an intermediate wallet (also called a "system wallet") that was used to transfer bitcoins from the pooled custodial wallets to the investors. That intermediate wallet maintained a balance of approximately 3-4 bitcoins to facilitate customer withdrawals.

66.     Once an investor initiated a withdrawal request, Vo would transfer bitcoin from the intermediate wallet to the investor's account.

67.     Many investors elected to leave their purported bitcoin earnings in their accounts and/or use those purported earnings toward their monthly hosting fees or remaining payments on their mining packages. Those supposedly earned bitcoins were never deposited in investor accounts and instead were left in the pooled custodial wallets.

68.     Vo, directly or indirectly, offered or sold the Hosting Agreements through the use of interstate facilities or the mails and interstate commerce. He directly offered and sold Hosting Agreements to investors through in-person meetings around the country. Vo also offered and sold Hosting Agreements to investors through VBit's website.

69.     Vo played an integral role in the offer and sale of the Hosting Agreements. As the founder, Vo created and launched VBit.

70.     No registration statement was in effect or had been filed with the Commission as to the offer or sale of the Hosting Agreements.

71.     Vo, through VBit, offered and sold Hosting Agreements that did not qualify for an exemption from registration. Vo's offering was to the general public and he did not take any steps to verify that investors were accredited. He raised approximately $95.6 million from approximately 6,400 investors in multiple states.

**Vo's Numerous Misrepresentations to Investors**

72.     Vo successfully solicited thousands of investors to enter into Hosting Agreements by making numerous misrepresentations. Vo, as the founder of VBit, knew, or was reckless in not knowing, that statements made by him, including statements made on VBit's website and in promotional materials, regarding his company's registration status, what he sold, what he did with investors' funds, and what he did with the bitcoins VBit mined, among other things, were false.

73.     Vo also misrepresented how much money existing VBit investors earned in bitcoin returns.

74.     Vo was responsible for all content on VBit's and Advanced Mining's websites, and all content in their promotional materials.

75.     Vo falsely claimed in promotional materials that VBit was "[f]ully compliant and registered with every appropriate US government entity."

76.     Vo also falsely claimed to at least one in-person audience that VBit was "registered with the SEC." VBit was not registered with the SEC. Aside from their incorporations in Delaware, the VBit entities were not registered with any U.S. government entity.

77.     Through VBit, Vo marketed the Hosting Agreements to investors as a way to earn passive income generated by mining rigs that VBit would solely possess, control, and combine into a larger mining pool with other investors.

78.     VBit sold Hosting Agreements for more mining rigs than VBit was actually operating.

14

79.    In 2020, VBit sold Hosting Agreements for 3,325 mining rigs but operated only 920 mining rigs.

80.    In 2021, VBit sold Hosting Agreements for approximately 8,472 mining rigs but operated only 1,643 mining rigs.

81.    By another metric, VBit sold a purported 8,472 mining rigs that were to generate a combined total of 846,700 terahash of daily power in 2021, but VBit in fact operated only 1,643 mining rigs that generated a combined total of 177,280 terahash of daily power that year.

82.    Vo knew, or was reckless in not knowing, from at least December 2018 onward that VBit was not operating a sufficient number of mining rigs to support the computing capacity of the Hosting Agreements that were offered and sold.

83.    Vo was responsible for VBit's decision to keep offering and selling Hosting Agreements despite his knowledge (or reckless disregard) that VBit did not operate enough equipment to fulfill those contractual agreements.

84.    In addition, Vo touted the opportunity to earn additional hashpower in the Hosting Agreements via a multi-level-marketing program. Investors who recruited downstream investors would receive increased hashpower beyond the mining rigs they purportedly purchased through the Hosting Agreements depending on how many new recruits they enlisted.

85.    By 2020, Vo did not even have enough mining rigs to fulfill the Hosting Agreements as initially sold by VBit, let alone any extra mining rigs to allocate additional hashpower to existing investors who recruited new investors as part of the multi-level-marketing program.

86.     As part of the scheme, Vo received millions of dollars from individuals who believed they purchased their own mining rigs and service packages when they entered into Hosting Agreements but, in reality, they did not.

87.     VBit maintained online accounts and investors were able to access their online accounts via an online investor portal.

88.     Vo concealed his fraudulent scheme by mispresenting to investors via their online accounts that their purported Hosting Agreements were earning bitcoin returns and the enterprise was operating as promised.

89.     While some investors made withdrawals, many investors used the bitcoin reflected in their online accounts to pay down the monthly costs of their Hosting Agreements.

90.     However, the data in each investor's online account was false and was displayed to provide the impression that VBit was operating mining rigs that were dedicated to that investor in accordance with the Hosting Agreements.

91.     Investors' online accounts did not reflect the actual account balances or the amount of bitcoin earnings by the mining rigs purportedly owned by the investor; rather, the purported balances and earnings were hypothetical based on a formula Vo created and that did not appear to have any relation to the actual number of bitcoins mined by the VBit mining pool.

92.     Vo used the mining rig's *designated* hashrate to populate the balance in investors' online accounts, rather than what was actually mined. A mining rig's actual hashrate is not constant and is almost never at the designated rate, if at all. Rather, it is variable and fluctuates based on a variety of factors, including temperature, humidity, power supply stability, firmware updates, and the age of the mining rig, among others.

93.     Moreover, although the investors' online accounts reflected earnings balances, the accounts were effectively empty until they made withdrawal requests, and even then, the accounts were only populated with the amounts of the requested withdrawals.

94.     Further, VBit did not have the funds available to back up the total balances reported on every investor's online account. This is because, for many of those investors, Vo misappropriated their invested funds (approximately $48.5 million) and never used their funds to acquire mining rigs or operate mining rigs to mine bitcoin on their behalf.

95.     As the founder and CEO of VBit, Vo had ultimate authority over the entire company and directed the information posted on the company's website, in promotional materials, and what was reflected in investors' online accounts. Accordingly, Vo's ultimate authority over the company included complete control over representations made to solicit investors.

96.     Even after Advanced Mining purportedly purchased VBit, Vo continued to operate the same control over all operations of the "former" VBit entities.

97.     Vo's misstatements were material as investors would want to know, among other things, that their investment contributions were not being used as represented—notably, to operate the number of mining rigs purportedly sold to investors pursuant to Hosting Agreements. Investors would also want to know that the company behind their investment was indeed registered with appropriate government regulators.

98.     Vo obtained money and property by means of making these false statements.

**Vo Misappropriated Approximately $48.5 Million**

99.    From at least December 18, 2020 through at least November 18, 2021, Vo transferred approximately $48.5 million of the approximately $95.6 million raised from investors directly to his personal bank accounts.

100.    Vo was able to make these transfers undetected because he exercised complete control over VBit's finances.

101.    Vo's complete control over VBit's finances allowed him to conceal from investors that the mining activity associated with the Hosting Agreements did not generate sufficient bitcoins to fund the payouts that had been promised to investors. Instead of accurately reflecting how many bitcoins had actually been mined as a result of Hosting Agreements entered into with each investor, Vo lulled investors by populating their accounts with hypothetical balances based on the formula he created, premised on designated hashrate.

102.    Vo structured VBit's payment system such that all payments received from investors were deposited into a VBit bank account that only he controlled.

103.    Vo was the only person who managed investors' funds.

104.    Vo gambled away a large sum of the misappropriated money.

105.    From December 18, 2020 through mid-October 2021, Vo transferred approximately $32.7 million of misappropriated investor funds from his personal bank account to his personal account on a crypto asset trading platform, some of which he used to purchase bitcoin and other crypto assets.

106.    Vo became aware of the SEC's investigation on or about October 19, 2021. Immediately after, between October 20, 2021 and November 18, 2021, Vo transferred approximately $15.7 million of investor funds from a VBit account to his personal bank account.

During this same time period, Vo then transferred approximately $13.8 million (of that $15.7 million) to his personal account on a crypto asset trading platform.

### Vo Sent Misappropriated Investor Money to Family Members

107.    Vo transferred large sums of misappropriated investor funds to his family members, who are named herein as Relief Defendants.

108.    Prior to October 2021, Vo gave his sister, Diem T. Vo, $300,000 of funds that he had misappropriated from VBit investors.

109.    On November 2, 2021, Vo gave his brother, Danny H. Vo, $500,000 of funds that he had misappropriated from VBit investors.

110.    On November 16, 2021, Vo initiated the process of transferring $1,000,000 of funds that he had misappropriated from VBit investors into a trust for his minor daughter, which was later established and funded in 2022.

111.    On November 16, 2021, Vo gave his friend $300,000 of funds that he had misappropriated from VBit investors, which the friend subsequently transferred to Vo's wife, Phuong D. Vo.

112.    On November 17, 2021, Vo gave his mother, My Tien Thi Nguyen, $100,000 of funds that he had misappropriated from VBit investors.

113.    Between November 16, 2021 and December 21, 2021, Vo gave his wife, Phuong D. Vo, an additional $1.8 million of funds that he had misappropriated from VBit investors.

114.    None of these family members—Diem T. Vo, Danny H. Vo, Phuong D. Vo, or My Tien Thi Nguyen—provided services or consideration in exchange for these funds, but instead Vo provided the funds as gifts. They have no legitimate claim to these funds.

**Vo Exited VBit and Fled the Country**

115.    After Vo learned of the SEC's investigation in October 2021, Vo took steps to exit the company and flee the country.

116.    On November 1, 2021, a website was registered for Advance Mining at www.advancedmininggroup.io.

117.    On November 19, 2021, Vo filed for divorce against his wife, Phuong D. Vo.

118.    On or about November 20, 2021, Vo left the United States. Vo's travel itinerary indicated that his final destination was Vietnam.

119.    On January 31, 2022, VBit announced it had been "sold" for $105 million to Advanced Mining, a supposed "Asian-based company" with "global" operations in the "crypto mining sector."

120.    In the announcement, Vo claimed the sale was intended to give him "peace of mind and freedom to focus on my health."

121.    Advanced Mining's newly registered website continued VBit's online presence and continued to offer Hosting Agreements.

122.    However, Advanced Mining did not exist as a legitimate business prior to the "acquisition" of VBit.

123.    Advanced Mining maintained the appearance of operating a bitcoin mining business for a few months following the "acquisition" of VBit.

124.    In June 2022, investors were frozen out of their VBit online accounts and could not make withdrawals.

125.    Notwithstanding the fact that investors were frozen out of their VBit online accounts, as recently as October 18, 2022, they were still receiving emails maintaining the fiction that VBit Technologies was purchased by Advanced Mining.

## VBIT'S HOSTING AGREEMENTS ARE SECURITIES

126.    VBit's Hosting Agreements are investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

127.    An investment contract involves: (1) the investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

128.    VBit's Hosting Agreements were offered and sold in exchange for money, transactions consummated via ACH payments and/or checks.

129.    VBit's Hosting Agreements were purportedly investments in a common enterprise. VBit told investors that the assets they were purportedly buying—i.e., the mining rigs—were pooled in VBit's mining pool, and that the bitcoins generated were reflected in investors' accounts according to the designated hashrate computing power of the mining rigs the investor "owned" per the Hosting Agreement they purchased. The fortunes of each investor were purportedly tied to the fortunes of other investors because every investor's chance of earning a profit was tied directly to the performance of the greater VBit mining pool, and the more investors recruited into the mining pool, the greater the chances of earning more bitcoins.

130.    Vo led investors to expect profits derived from the efforts of third parties—Vo and his agents—because investors relied on VBit's operation and control of the mining rigs to generate profits. Mining rigs sold per the terms of the Hosting Agreements were bundled with an obligation to give possession and control to VBit. Pursuant to the Hosting Agreements, VBit

21

investors needed VBit's permission to access the facility where the mining rigs were maintained, and if permission was granted, they even needed to be chaperoned by a VBit representative. Moreover, investors were not provided with any serial number or any other information from which they could identify a particular mining rig they purportedly owned, nor could they have been, because VBit never created or maintained any such records.

131.    While the Hosting Agreements did allow investors the option of allocating their mining rigs' hashpower to a large-scale third-party mining pool different than the one Vo selected, such authority was illusory because investors were not assigned specific mining rigs. If VBit granted such a request, then the only way to comply would be to assign the requisite number of randomly selected mining rigs to the requested mining pool.

132.    In addition, once VBit investors signed the Hosting Agreements, they were effectively obligated to stay with VBit. While the Hosting Agreements did allow investors to request termination of the agreement and take possession of what were purportedly their mining rigs, VBit had discretion to grant or deny the request, and the cost for the investor to do so would have been prohibitive due to the acceleration of payments due and the shipping fees.

133.    In addition, VBit's efforts performed in connection with the Hosting Agreements were entrepreneurial and managerial. VBit decided where to physically deploy the assets, including the decision to purchase a facility in Montana and deploy the mining rigs there, and selected which brand of mining rigs to offer investors. In addition, VBit had exclusive authority to design the physical layout of the facility, choose the type of cooling system at the facility, and to decide when to use "low power mode" for the facility. Vo also decided whether to change the mining pool the VBit collection of mining rigs participated in to best maximize returns and exploit the assets' value.

134.    As a result, investors who purchased Hosting Agreements did so with the expectation of earning passive income and relied exclusively on VBit's efforts to earn a profit as the investors did not possess, control, or have agency over the mining rigs they purportedly purchased.

### FIRST CLAIM FOR RELIEF
**Unregistered Offers and Sales of Securities in Violation of
Sections 5(a) and 5(c) of the Securities Act**

135.    The Commission repeats and realleges Paragraphs 1 through 134 of its Complaint.

136.    The Hosting Agreements constitute investment contracts, and thus "securities" under Section 2(a)(1) [15 US.C. §77b(1)] of the Securities Act.

137.    No registration statement was filed or in effect with respect to the Hosting Agreements offered and sold.

138.    Defendant directly or indirectly, singly or in concert,

a.    made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

b.    for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and/or

c.    made use of means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell or offer to buy, through

the use or medium of a prospectus or otherwise, securities as to which no

registration statement had been filed.

139.    By reason of the foregoing, Defendant violated, and, unless enjoined, is

reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C.

§§ 77e(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Fraud in Violation of Section 17(a) of the Securities Act

140.    The Commission repeats and realleges Paragraphs 1 through 134 of its Complaint.

141.    By engaging in the conduct described above, Defendant, directly or indirectly,

singly or in concert, in the offer or sale of securities and by the use of the means or instruments

of transportation or communication in interstate commerce or the mails,

      a.    knowingly or recklessly employed one or more devices, schemes or

artifices to defraud;

      b.    knowingly, recklessly, or negligently obtained money or property by

means of one or more untrue statements of material fact or omitted to state

one or more material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not

misleading; and/or

      c.    knowingly, recklessly, or negligently engaged in one or more transactions,

practices or courses of business which operate or would operate as a fraud

or deceit upon a purchaser.

142.    By reason of the foregoing, Defendant violated, and, unless enjoined, is

reasonably likely to continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

143.    The Commission repeats and realleges Paragraphs 1 through 134 of its Complaint.

144.    Defendant directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly,

      a.    employed one or more devices, schemes, or artifices to defraud;

      b.    made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.    engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

145.    By reason of the foregoing, Defendant violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## FOURTH CLAIM FOR RELIEF
### Equitable Claim with Respect to Relief Defendants

146.    The Commission repeats and realleges Paragraphs 1 through 134 of its Complaint.

147.    Relief Defendants, directly or indirectly, received funds or benefitted from the use of such funds, which are the proceeds, or traceable to the proceeds, of Defendant's unlawful activity as alleged in paragraphs 1 through 134.

148.    Relief Defendants have no legitimate claim to these funds that they received or from which they otherwise benefitted, directly or indirectly.

149.    Based upon the allegations set forth above, Relief Defendants have been unjustly enriched by their direct or indirect receipt or benefit from investor funds and it is not just, equitable, or conscionable for them to retain these funds.

150.    Under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)], the Commission is entitled to an order requiring Relief Defendants to disgorge all of the proceeds of investor funds they received or from which they benefitted, either directly or indirectly in an amount to be determined by the Court.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find Defendant committed the violations alleged and enter a final judgment:

## Permanent Injunctions

Permanently restraining and enjoining Defendant, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating the federal securities laws alleged in this Complaint; and further permanently restraining and enjoining Defendant, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly from participating directly or indirectly in any issuance, purchase, offer, or sale of any security; provided, however, that, such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

**Disgorgement and Prejudgment Interest**

Ordering Defendant and Relief Defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Section 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d), (5) and (7)].

**Civil Penalty**

Ordering Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**Officer and Director Bar**

Issue an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], barring Defendant from serving as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [I5 U.S.C. § 78o(d)].

**Further Relief**

Granting any other and further relief this Court may deem just and proper.

**Demand for Jury Trial**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: December 17, 2025                    Respectfully submitted,

                                            */s/Judson T. Mihok*
                                            Judson T. Mihok
                                            Gregory R. Bockin
                                            David W. Snyder
                                            Assunta Vivolo

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Phone: 215-597-6500
Fax: 215-597-2740
Email: MihokJ@sec.gov